In the Matter of **PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

In re **PAYMENT OF TAXES IN COMPLIANCE WITH SECTION 605 OF THE REGIONAL RAIL REORGANIZATION ACT AMENDMENTS OF 1975.**

**No. 70–347.**

United States District Court, E. D. Pennsylvania.

Oct. 20, 1975.

Carl Helmetag, Jr., and Terrence M. Quirin, Philadelphia, Pa., for Trustees, PCTC.

Gratz, Tate, Spiegel, Ervin & Ruthrauff, by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford RR. Co.

Jerome E. Sharfman, Washington, D. C., for the U.S.A.

Ballard, Spahr, Andrews & Ingersoll by Lewis A. Grafman, Philadelphia, Pa., for Girard Trust Bank.

Stanley Buchsbaum, New York City, for the City of New York.

Thomas Zolezzi, Albany, N. Y., for State of New York.

Alan Bouffard, Asst. City Sol., for City of Pittsburgh.

Hughes, Hubbard & Reed by William M. Barron, New York City, for Travelodge International, Inc.

Fell, Spalding, Goff & Rubin by Charles C. Coyne, Philadelphia, Pa., and Demov, Morris, Levin & Shein, New York City, by Robert S. Ordman, for Washington Federal Savings & Loan Assn.

## MEMORANDUM AND ORDER
## NO. 2049

FULLAM, District Judge.

On February 28, 1975, Congress enacted the Regional Rail Reorganization Act Amendments of 1975, P.L. 94-5, "to provide emergency financial assistance to bankrupt rail carriers in the Northeast and Midwest in order to continue essential rail services." See Report of the House Committee on Interstate and Foreign Commerce, February 10, 1975, p. 3.

Section 605 of the amendatory statute provides as follows:

"§ 605(a) Notwithstanding any other provision of law, no railroad in reorganization shall withhold from any State, or any political subdivision thereof, the payment of the portion of any tax owed by such railroad to such State or subdivision, which portion has been collected by such railroad from any tenant thereof.

"(b) Any railroad which violates the provisions of subsection (a) of this section by withholding any portion of a tax referred to in such

**108**

subsection shall be fined not more than $10,000 for each such violation."

In July, the Trustees of the Debtor filed with this Court a report, dated July 15, 1975, setting forth the actions taken and proposed to be taken by the Trustees to comply with § 605, as they interpreted it. Pursuant to Order No. 1970, copies of this report have been furnished to all taxing authorities and other interested parties, all of whom have been afforded an opportunity to respond to the Trustees' proposals. Various objections having been filed, a hearing was held on October 15, 1975.

1. *Past Practice.*

Pursuant to Order No. 70 in these proceedings, the Trustees have, for the most part, deferred the payment of all state and local real estate taxes assessed against the Debtor's property. *In re Penn Central Trans. Co.,* 325 F.Supp. 294 (E.D.Pa.1970), *aff'd,* 452 F.2d 1107 (3d Cir. 1971), *cert. denied,* 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972). The funds which would otherwise have been used to pay such taxes have been expended by the Trustees to meet other operating expenses of the Debtor.

Much of the Debtor's real estate is leased to tenants. Rents paid by the tenants are included in the revenues of the Debtor which have been expended in support of continued rail service. In many instances, the lease arrangements between the Debtor and its tenants include provisions whereby an identifiable portion of the rent charged is attributable to taxes upon the property. In some cases, the tenant is required to pay a base rent plus, *inter alia,* an amount equal to the taxes assessed against the real estate. In other instances, by virtue of so-called "tax escalator clauses" the tenant is required to pay a base rent plus an amount equal to any increases in the taxes assessed against the property.

In Orders Nos. 107 through 118, certain tenants of valuable New York real estate holdings of the Debtor were authorized to pay taxes directly to the taxing authorities, rather than to the Debtor as contemplated by their leases. But with those exceptions, it is generally accurate to state that no real estate taxes assessed against the Debtor's properties have been paid since reorganization, until after the enactment of § 605; and that all sums paid to the Trustees by tenants have been used to meet current operating expenses, even though some of those payments had the effect of satisfying the tenant's obligation to pay the equivalent of taxes or increased taxes upon the particular property involved.

2. *Identifying the Tax Amounts Subject to the Provisions of § 605.*

Section 605 refers to "the payment of the portion of any tax owed by such railroad to such State or subdivision, which portion has been collected by such railroad from any tenant thereof." All taxes are assessed against, and owed by, the Debtor. In the case of rental property, it is a reasonable assumption that the total amount of what the tenant pays to the landlord is calculated at least in part upon the taxes assessed against the property, no matter what terminology is employed in the lease arrangement. Hence, the argument could conceivably be made that some portion of all rent collected by the Trustees is within the statutory terminology, " . . . the portion of any tax owed by such railroad . . . which portion has been collected by such railroad from any tenant thereof."

At the other extreme, it could perhaps be argued that no portion of any tax is ever collected from the tenant, as a tax, but only as rent. In their July 15, 1975 report, the Trustees adopt the more reasonable approach, namely, that § 605 was intended to apply to that portion of the payment made by a tenant which is specifically identifiable as intended by the parties to cover real estate taxes on the demised property. Under this view, it is immaterial whether the "tax" portion of the tenant's payment is made by a separate check, or whether it covers all, or only an increase in, the taxes as-

sessed against the property. Whatever portion of the tenant's payment is specifically allocated by the parties, under the terms of the lease arrangement, for taxes is now payable under § 605.

█ The legislative history makes it clear that the Trustees' interpretation is in accord with Congressional intent, and no one has expressed an objection to that aspect of the Trustees' present proposal.

### 3. *Retroactivity.*

The amounts received from tenants attributable to taxes in accordance with the definition discussed above is approximately $8 million per year and, for the period from the filing of the reorganization petition to the effective date of § 605 aggregated approximately $30 million. The principal dispute now before the Court centers upon whether § 605 was intended to apply only to amounts collected by the Trustees from tenants after the effective date of that statute, or whether Congress intended to require immediate payment of all sums thus collected in the past as well. The Trustees and counsel for the Government argue that Congress obviously intended only prospective application of § 605. The taxing authorities, on the other hand, argue that the literal meaning of the statute clearly covers all such monies, irrespective of when they may have been received; that there is no occasion for resort to legislative history in interpreting the statute; and that, in any event, the legislative history is consistent with their literal interpretation.

Everyone concedes that the statutory language can be interpreted to require immediate payment of the $30 million in "tax" payments collected from tenants before the statute was enacted, as well as to such payments collected thereafter. Undoubtedly, such taxes are "owed by such railroad" and each such payment "has been collected by such railroad from any tenant thereof;" and the statute makes it illegal for the railroad to "withhold from any State, or any political subdivision thereof, the payment of"

such taxes. On the other hand, I am not persuaded that this is the only possible interpretation of the literal wording of the statute. It is at least arguable that the framers used the word "withhold" to refer to sums still in the possession of the Trustees. The dictionary definition of "withhold" includes "to hold back," and "to keep in one's possession or control," Webster's *Third New International Dictionary*. I therefore reject the suggestion that the wording of § 605 is so clear and explicit as to make it improper for the Court to apply the normal principles of statutory construction.

And, when § 605 is considered in context, and in the light of its legislative history, the correctness of the interpretation advanced by the Trustees and counsel for the Government becomes immediately apparent.

The fact that state and local taxing authorities were, in effect, for the short term, subsidizing the interim operations of the Debtor's railroad, because the Trustees were deferring payment of taxes, was certainly well known to Congress when the RRRA was initially enacted, as well as when the 1975 amendments were being considered. The undesirability of continuing this arrangement was referred to in virtually every report which the Trustees filed with this Court concerning their progress, or lack of progress, in attempting to achieve a conventional § 77 reorganization, and was the subject of frequent comment in Opinions of this Court. Congress did not see fit to alter the situation in the RRRA itself. The continuing deferral of real estate taxes was stressed in all of the arguments challenging the constitutionality of the RRRA.

█ When the 1975 amendments were under consideration, the principal aim of Congress was to prevent the imminent cessation of rail service for lack of cash. The committee hearings in both houses of Congress were devoted principally to attempting to determine the amount of additional cash which would be needed by the railroads through

the conveyance date in 1976, and the terms and conditions upon which the additional funding would be provided. None of the cash forecasts which were considered contemplated any payment of taxes by the Trustees.

Section 605 was a last-minute addition to the amendatory statute, and received very little consideration or debate. The Senate committee never considered it. Congressman Rinaldo, the sponsor of § 605, explained to the House Committee on Interstate and Foreign Commerce that the purpose of his measure was to impose a requirement "that *henceforth* any such tax monies must pass through and be given to the governmental body to which they are legally owed." Hearings on H.R. 2051 and S. 231, Committee on Interstate and Foreign Commerce, 94th Cong., 4th Sess. 234 (1975).

It is simply inconceivable that Congress, having carefully made a judgment as to the amount of additional funding which would be required to keep the railroads operating until the conveyance date under the RRRA, and having, with frequently expressed reluctance, provided that necessary funding, intended, simultaneously and without significant discussion, to require the railroad to make an immediate payment of $30 million from non-existent funds.[1]

In interpreting § 605 of the 1975 amendments, I am required to consider it in the context of the entire system of laws of which it forms a part. *Brown v. Duchesne,* 19 How. 183, 60 U.S. 183, 194, 15 L.Ed. 595 (1856). Construed in conjunction with § 77(j) of the Bankruptcy Act, 11 U.S.C. § 205(j), the RRRA, and the 1975 amendments themselves, § 605 seems clearly to have been intended to relate only to tax payments collected by the Trustees from tenants after the ef-

fective date of the statute. Moreover, subsection (b) of § 605 imposes criminal sanctions. In reliance upon Order No. 70, which was upheld by the Court of Appeals and denied review by the Supreme Court, the Trustees spent the money collected from tenants before § 605 was enacted. It is inconceivable that Congress intended to require the Trustees, under pain of criminal penalties, to do the impossible, namely, restore to the Debtor's estate and thence to the taxing authorities funds long since spent with judicial approval.

The taxing authorities argue that the effect of § 605 was to declare that all sums received from tenants attributable to taxes constitute trust funds. The relevance of this characterization is not entirely clear. In a sense, the argument proves too much, since it bolsters the connotation that Congress was dealing with funds actually held by the Trustees, rather than funds previously expended with court authorization. Moreover, with respect to sums due by reason of an alleged breach of trust, the obligation of the Trustees would presumably rank as an administrative claim of high priority, but it is not clear that this ranking would be any better than that already accordable to all claims for post-reorganization taxes. In short, characterizing payments received from tenants for taxes as trust funds would not really shed any further light upon Congressional intent as to when such claims should be paid. Be that as it may, the argument that these monies should be regarded as trust funds is so clearly lacking in merit as to require no discussion.

For all the foregoing reasons, I am satisfied that the procedures outlined in the July 15, 1975 report of the Trustees are in conformity with § 605.

---

1. The total amount by which Congressional projections of future cash needs would be rendered incorrect by retrospective application of § 605 is approximately $30 million. The Trustees concede that, even under their prospective interpretation of the statute, § 605 would require cash outlays in the range of $5 million to $8 million more than the projections evaluated by Congress. Apparently, however, the latter discrepancy is of manageable magnitude.

And now, this 20th day of October, 1975, upon consideration of the "Petition of the Trustees Respecting Their Compliance With § 605 of the Regional Rail Reorganization Act Amendments of 1975, Public Law 95–5 [94–5]," and after hearing thereon, it is hereby ORDERED:

1. That the actions taken and proposed to be taken by the Trustees as set forth in their July 15, 1975 Report to the Court are hereby approved as being in conformity with the requirements of § 605 of the Regional Rail Reorganization Act Amendments of 1975.

2. That the Trustees are authorized to continue making payments to the appropriate taxing districts in the manner set forth in the aforesaid Report dated July 15, 1975.