**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re SALE OF the WALDORF–ASTORIA HOTEL.**

**No. 70–347.**

United States District Court, E. D. Pennsylvania.

March 23, 1977.

Ivan Shomer, Philadelphia, Pa., for the Trustees, Penn Central Transportation Co.

Edith I. Spivack, New York City, for the City of New York.

Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford Railroad Co.

Friedman & Koven by Steven L. Bashwiner and George Cowell, Chicago, Ill., for Hilton Hotels and Waldorf-Astoria Hotel.

## MEMORANDUM AND ORDER NO. 2868

FULLAM, District Judge.

The Trustees have petitioned for authority to sell the Debtor's interest in the land and improvements known as, and the personal property contained in, the Waldorf-Astoria Hotel to the present lessee, the

Hotel Waldorf-Astoria Corporation. Since the record amply demonstrates that the sale price, $35 million, is fair and that consummation of the sale would be advantageous to the estate, I will enter an Order approving the sale.

■ The City of New York has objected to two aspects of the Trustees' Petition which are not related to the merits of the proposed sale. Consistently with § 77(o) of the Bankruptcy Act and the established practice in these proceedings, the property is to be conveyed free and clear of liens, the existing liens are to attach to the proceeds of sale, and the proceeds are to be deposited in an escrow account. The City's tax liens on the Waldorf total approximately $9.75 million (excluding interest). In its Answer the City requested that at closing its outstanding tax liens be paid in full from the proceeds. However, in its brief and at oral argument the City conceded that the Reorganization Court has authority to authorize the sale of the Waldorf free of the City's tax liens, provided that the liens attach to the proceeds. Of course, the City's request for present payment may be understood as addressed to this Court's discretion. There are, however, sound reasons for adhering to the practice of escrowing proceeds of sale subject to existing liens. In the first place, the lien of the United States arising from its guarantees of Trustees' certificates and loans under § 211(h) of the RRRA primes the City's liens. The City's tax liens may not be paid without the consent of the United States. Second, the entire question of the Debtor's unpaid tax obligations is now before this Court in other proceedings arising from the Trustees' proposed Plan of Reorganization. In light of these pending issues, it is not appropriate at this juncture to depart from the uniform practice in this case of escrowing proceeds of sale subject to existing liens.

In addition to claiming that the sale proceeds should be used to satisfy its tax liens, the City makes an alternative argument with respect to a pre-existing escrow account. Pursuant to a November 1973 agreement between the Trustees and the lessee, rent accruing after November of 1975 has been deposited in an escrow account (lessee's escrow account) maintained by counsel for the lessee. The approximately $11.818 million principal[1] in the account is made up of three separate rental payments:

| | | |
|---|---|---|
| Basic rent, November '73 to February '77 | — | $4,333,333.34 |
| Percentage rent, September '73 to January '77 | — | 4,990,854.07 |
| Additional rent, October '73 to February '75 | — | 2,494,477.86 |

Under the terms of the lease, "additional rent" is defined as all New York real estate taxes attributable to the building and approximately 58% of the real estate taxes due on land considered as unimproved. After February of 1975, no "additional rent" payments have been paid into the lessee's escrow account. Rather, as required by § 605 of the Railroad Reorganization Act Amendments of 1975,[2] 45 U.S.C. § 794, all "additional rent" collected from March of 1975 until present have been paid directly to the City.

The lessee has agreed that the funds in the lessee's escrow account are to be released to the Trustees at closing. The Trustees propose that thereupon the funds should be treated as unrestricted assets of the estate.[3] On the other hand, New York City maintains that these funds must be used to satisfy its outstanding tax liens.

1. The interest earned to date is approximately $1.325 million.

2. P.L. 94–5.

3. In order to facilitate the closing and to avoid potential delays that might arise from the filing of an appeal from the order approving the sale, the Trustees have agreed to deposit the funds now in the lessee's escrow account in a new escrow account for the benefit of the lessee-buyer's title insurance company. I agree with the City's position that this new escrow arrangement is not relevant to its basic contention that it is entitled to the funds in the lessee's escrow account.

The City's claim to the funds in the lessee's escrow account is predicated on § 605(a), which provides:

"Notwithstanding any other provision of law, no railroad in reorganization shall withhold from any State, or any political subdivision thereof, the payment of the portion of any tax owed by such railroad to such State or subdivision, which portion has been collected by such railroad from any tenant thereof."

Numerous taxing authorities, including the City, fully explored the meaning of § 605 in proceedings before this Court in the fall of 1975. At that time I held that § 605 applies only to rents, or portions thereof, which are "specifically identifiable as intended by the parties to cover real estate taxes." *In the Matter of Penn Central Trans. Co. (Payment of taxes in compliance with § 605 of the RRRA Amendments of 1975), 402 F.Supp. 106, 108 (E.D.Pa.1975).* Of the three kinds of rental payments defined in the lease and deposited in the lessee's escrow account (basic, percentage, and additional) only additional rent is intended to cover real estate taxes. Recognizing the conclusion that must follow from an analysis of the lease, the City argues that the lease should not be controlling in the unique circumstances of this case.

Under the Waldorf lease, if the lessor fails to pay the additional rent to the City, the lessee may deduct from subsequent basic and percentage rent payments an amount equal to the additional rent which has not been paid to the City. Under Order No. 70 in this proceeding, the Trustees have deferred payment of real estate taxes due the City and all other tax entities throughout the system. Thus, at the time that the lessee's escrow account was established in November of 1973, substantial additional rental payments had been received by the Trustees but not paid over to the City. It follows, the City argues, that the basic and percentage rent payments in the lessee's escrow account are really deductions or set-offs intended for the payment of real estate taxes. While there is superficial merit in the City's position, it is incorrect for several reasons.

Since the Trustees were authorized under Order No. 70 to defer taxes, it is, at the least, doubtful that a contractual right of setoff ever arose. Secondly, even if the contractual right of setoff did arise, Order No. 1 enjoins the exercise of such right. Moreover, the letter from the lessee's counsel confirming the escrow arrangement (Doc. No. 12524, Ex. B) makes it clear that the escrow arrangement was without prejudice to the rights of the Trustees and the lessee later to assert their respective positions with respect to the disposition of the funds in the account. It is simply impossible to conclude, as the City suggests, that the lessee had exercised its contractual right of setoff (assuming it had the right to do so) when it not only was enjoined from setting off, but also never purported to do so. In sum, § 605 does not apply to the basic and percentage rent portions of the funds in the lessee's escrow account.

In the earlier proceedings involving § 605, the question of whether § 605 was retroactive was also litigated. On this issue I held that § 605 applied only "to tax payments collected by the Trustees from tenants after the effective date of the statute." 402 F.Supp. at 110. Indeed, the Trustees' proposed plan for discharging their responsibilities under § 605, which I found at the time to be consistent with § 605, made specific mention of the Waldorf lessee's escrow account and indicated that no portion of the account was to be paid out (Doc. No. 9174, p. 5). Technically, the City should not now be permitted to relitigate § 605's applicability to the funds in the lessee's escrow account. However, I am not prepared to hold the City to strict rules of *res judicata* and collateral estoppel. Instead, I will consider the facts associated with the lessee's escrow account anew.

It can be argued that the Trustees have not yet "collected" the additional rent in the lessee's escrow account because the funds are still in the control of the escrow agent. On the other hand, because the payment of rent to the escrow agent discharged the lessee's obligation to pay such

rent and the escrow agent held the funds subject to the respective rights of the parties, it appears to follow that the Trustees should be deemed to have collected the additional rent prior to March of 1975. If that were true, the City would not be entitled to receive even the additional rent in the lessee's escrow account.

▮ Finally, the City presses an equitable theory based on Orders Nos. 107 through 118. Most of the Debtor's mid-Manhattan properties are leased to firms which have constructed large office buildings thereon. Almost all these ground leases have additional rent provisions similar to the provisions in the Waldorf lease. Early in the case a number of the mid-Manhattan ground lessees petitioned the Court for equitable relief. Under their mortgages non-payment of real estate taxes constituted a default. Thus, if the Trustees did not pay the additional rent to the City, the ground lessees were subject to acceleration of their mortgages. A somewhat less burdensome alternative open to the ground lessees was for them to pay their taxes a second time, but this time directly to the City, and rely on an equitable subordination theory for recovery of their second payment. At the time the ground lessees' petitions were presented to the Court, I concluded that the equities justified an exception, and the petitioning ground lessees were permitted to pay their taxes directly to the City. An additional factor in my thinking at that time was that permitting such direct payments also lessened the burden of the Debtor's reorganization on the City.

The City reasons that if the Waldorf lessee had sought an order permitting it to pay its additional rent directly to the City, the lessee would have been entitled to such an order. From this premise the City apparently concludes that the lessee's escrow account arrangement is tantamount to a recognition by the Trustees of the Waldorf lessee's right to pay its taxes directly to the City, and, therefore, the Court should treat the funds in the lessee's escrow account as if a petition had been actually filed and granted. Of course, the Waldorf lease cov-

ers the fee and improvements, and therefore there was never any risk of mortgage acceleration. Extension of Order No. 107 to the Waldorf lease would have presented a significant issue, because there were many other leases which had similar additional rent provisions. In connection with the hearings which preceded my previous Opinion concerning § 605, the Trustees estimated that between June of 1970 and March of 1975 approximately $30 million, or about $6.2 million per year, was received under additional rent provisions. Suffice to say, in light of the cash needs that existed in November of 1973 and persisted through the conveyance date, April 1, 1976, it is reasonable to conclude that the Trustees would have objected to permitting the Waldorf lessee or others similarly situated to pay their additional rent directly to the appropriate taxing authorities. Certainly, I would have been reluctant to grant such relief and thus further jeopardize the Trustees' capacity to provide adequate rail service. The upshot of all this is that the Waldorf lease situation and the ground lessees' circumstances are substantially different. It is not possible to accept the City's theory that the Waldorf lessee was entitled to an order permitting direct payment to the City, and, therefore, the City's equitable claim must be rejected.

▮ One aspect of the City's argument remains to be considered. The City has borne a heavy burden of the Trustees' tax deferrals, and the City is in need of all available funds to meet the needs of its citizens. Section 605 was presumably a recognition by the Congress of this basic fact of life. In the earlier litigation involving § 605, the question posed was whether the Trustees were required to pay to various taxing authorities amounts equal to the tax rents collected from June of 1970 through February of 1975. Those rents had already been spent on rail operations, and there was no cash available to make retroactive payments to the taxing authorities. In addition, the Congressional deliberations on the RRRA Amendments of 1975 made it clear that Congress did not contemplate that

§ 605 would be retroactively applied. Therefore, I concluded that only taxes actually collected after the effective date of § 605 were to be paid over to taxing authorities. A finding that in the unique circumstances of this case the additional rents should be deemed "collected" after the effective date of § 605 is not inconsistent with my previous construction of the section and best fosters the Congressional purpose.

To summarize, I have concluded that the "additional rent" component of the lessee's escrow account, in the sum of $2,494,477.86, shall, promptly after closing, be paid over to the City on account of its tax claims, pursuant to § 605(a) of the Rail Act, as amended.